1   STACEY P. GEIS, SB No. 181444
    sgeis@earthjustice.org
2   PAUL R. CORT, SB No. 184336
    pcort@earthjustice.org
3   COLIN C. O'BRIEN, SB No. 309413
    cobrien@earthjustice.org
4   GREGORY D. MUREN, SB No. 319313
    gmuren@earthjustice.org
5   EARTHJUSTICE
    50 California Street, Suite 500
6   San Francisco, CA 94111
    Tel: (415) 217-2000
7   Fax: (415) 217-2040

8   *Attorneys for Plaintiffs*

9                    UNITED STATES DISTRICT COURT
10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  COMITÉ PROGRESO DE LAMONT,              Case No.
    COMMITTEE FOR A BETTER ARVIN,
13  COMMITTEE FOR A BETTER SHAFTER,         **COMPLAINT**
    CENTRAL CALIFORNIA ENVIRONMENTAL
14  JUSTICE NETWORK, ASSOCIATION OF
    IRRITATED RESIDENTS, MEDICAL
15  ADVOCATES FOR HEALTHY AIR, NATIONAL
    PARKS CONSERVATION ASSOCIATION, and
16  SIERRA CLUB,

17          Plaintiffs,

18          v.

19  UNITED STATES ENVIRONMENTAL
    PROTECTION AGENCY and MICHAEL S.
20  REGAN, in his official capacity as Administrator of
    the United States Environmental Protection Agency,
21
            Defendants.
22

23                    **NATURE OF THE ACTION**

24          1.      This action is brought under the federal Clean Air Act, 42 U.S.C. §§ 7401-7671q, to

25  compel the U.S. Environmental Protection Agency (EPA) to take the statutorily required action of

26  promulgating a federal implementation plan addressing unapproved elements of the State of

27  California's plans to attain the 1997, 2006, and 2012 national ambient air quality standards for fine

28  particulate matter in the San Joaquin Valley, California.

**INTRODUCTION**

2.      The Clean Air Act establishes a framework for ensuring all areas of the country have air that is safe to breathe. EPA is responsible for setting, and regularly reviewing, national air quality standards establishing the maximum allowable ambient concentrations of different pollutants. States with air basins that fail to meet these standards must adopt state implementation plans outlining the measures that will be implemented to clean the air and attain the standards by statutorily imposed deadlines. Where states fail or refuse to adopt required plans, EPA is obligated to adopt federal implementation plans to address any shortfalls.

3.      One of the most dangerous forms of air pollution is particulate matter pollution. Particulate matter consists of tiny, dirty motes that come from sources like diesel exhaust, agricultural activities, and heavy industry. The most dangerous particulate matter particles are the smallest. Called "fine particulate matter," or "PM-2.5," these tiny particles can be easily inhaled deep into the lungs and even absorbed into the bloodstream where they can cause a host of negative health impacts, including premature death in people with heart or lung disease, nonfatal heart attacks, irregular heartbeat, aggravated asthma, and decreased lung function.

4.      High levels of PM-2.5 in the air also cause haze that blocks visibility, including in some of our nation's most majestic national parks. And PM-2.5 harms the environment as well by, among other things, unsettling ecosystems and depleting nutrients in soil.

5.      The San Joaquin Valley air basin has, by far, the worst PM-2.5 pollution in the nation. The four most polluted counties in the U.S. for annual PM-2.5 are in the San Joaquin Valley, and 17 of the 18 monitoring sites in the Valley registered average annual PM-2.5 values above those allowed by the Clean Air Act from 2018 to 2020.

6.      PM-2.5 especially threatens underserved populations. People of color and poorer people are more likely to be exposed to unhealthy PM-2.5 levels and, once exposed, are more likely to die as a result of the exposure.

7.      These racial and economic disparities have played out tragically in the San Joaquin Valley. According to the Census, the San Joaquin Valley has, proportionally, a much larger population that identifies as people of color and/or Hispanic or Latino than the state or country as a

whole, as well as a much larger population living in poverty. And indeed, premature death and other air-related harms are more prevalent in the Valley than elsewhere, and are particularly prevalent in communities of color and poorer communities.

8.      In December 2018, EPA issued findings under the Clean Air Act that the State of California had failed to develop and submit to EPA state implementation plan revisions to provide for attainment of the 1997, 2006, and 2012 national ambient air quality standards for PM-2.5 in the San Joaquin Valley. These findings, which became effective in January 2019, triggered a nondiscretionary obligation under 42 U.S.C. § 7410(c)(1) for EPA to promulgate a federal implementation plan within two years, unless the State submitted, and EPA approved, the required state implementation plan revisions.

9.      EPA has yet to receive and approve all of the required state implementation plan revisions, and thus EPA has been overdue since January 2021 to promulgate a federal implementation plan.

10.     The Clean Air Act's federal implementation plan requirement is an important backstop that protects citizens against ineffective state air quality regulation. Nowhere is that backstop more needed than in the San Joaquin Valley: the Valley still has not met EPA's original, long-outdated 1997 national ambient air quality standards for PM-2.5, which have been updated twice since then to provide needed health and welfare protections.

11.     This action seeks to compel Defendants EPA and MICHAEL S. REGAN, in his official capacity as EPA Administrator, to perform their mandatory duty to ensure that the residents of and visitors to the San Joaquin Valley are finally provided the health and welfare protections promised by law.

**JURISDICTION**

12.     The Court has jurisdiction over this action to compel the performance of EPA's non-discretionary duties pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. §§ 1331 and 1361. The Court also has authority to order declaratory and injunctive relief pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. §§ 2201 and 2202.

**NOTICE**

13.   In accordance with 42 U.S.C. § 7604(b)(2) and 40 C.F.R., pt. 54, Plaintiffs notified the Administrator of the violations alleged herein, and of Plaintiffs' intent to initiate the present action. This notice was provided via certified mail on September 10, 2021, and addressed to the Administrator. *See* Exhibit A (Letter from Stacey P. Geis, *et al.*, counsel for Plaintiffs, to EPA Administrator, dated Sept. 10, 2021). At least 60 days have passed since notice was served, and the violations complained of are continuing.

**VENUE**

14.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) since: (a) this district is one in which Defendant EPA resides and performs its official duties; (b) a substantial part of the events and omissions giving rise to this claim have occurred in this district because EPA's Regional Office in San Francisco, California, has a substantial role in implementing the EPA duties at issue in this case; and (c) Plaintiff SIERRA CLUB resides in this judicial district.

15.   Similarly, because Defendant EPA resides in San Francisco and Plaintiff SIERRA CLUB resides in Oakland, assignment to the San Francisco or the Oakland Division of this Court is proper under Civil Local Rule 3-2(c) & (d).

**PARTIES**

16.   Plaintiff COMITÉ PROGRESO DE LAMONT is a community group in the San Joaquin Valley. Lamont is a farming community located south-southeast of Bakersfield in Kern County. Comité Progreso de Lamont has approximately six members. Comité Progreso de Lamont's mission is to achieve a healthy environment in Lamont and to improve community infrastructure and the quality of the lives of Lamont residents by involving the community and creating a voice to advocate for and address issues that Lamont is facing. Comité Progreso de Lamont and its members are concerned about their health and the health of other Valley residents as a result of high PM-2.5 levels in the San Joaquin Valley.

17.   Plaintiff COMMITTEE FOR A BETTER ARVIN is a 501(c)(3) nonprofit organization and resident of Kern County whose approximately fifty members reside and, in some cases, own property in Arvin, California, in the San Joaquin Valley. Committee for a Better Arvin's

mission is to improve the quality of life in Arvin, to inform and unite the community, to address problems facing the community, and to secure equality for all residents. Committee for a Better Arvin and its members have engaged in advocacy for improved local and regional air quality for many years and are concerned about the impacts of high PM-2.5 levels in the San Joaquin Valley.

18.     Plaintiff COMMITTEE FOR A BETTER SHAFTER is a 501(c)(3) nonprofit organization whose members reside and, in some cases, own property in Shafter, California—a city located in the San Joaquin Valley. Incorporated in 2012, Committee for a Better Shafter has approximately twelve full-time members and thirty families that partner in its community garden. Committee for a Better Shafter's mission is to work to improve the quality of life in Shafter, to inform and unite the community, to address the environmental problems that impact the community, and to ensure equality for all residents of Shafter. Committee for a Better Shafter was created to promote organic and sustainable agriculture through community gardens. Committee for a Better Shafter and its members and community gardeners actively engage on air quality issues, owing to their concerns about the impact of air pollution upon their health and crops; members participate in local, state, and national clean air advocacy efforts.

19.     Plaintiff CENTRAL CALIFORNIA ENVIRONMENTAL JUSTICE NETWORK (CCEJN) is a community group. It is a coalition of grassroots environmental justice groups and individuals with the mission to empower San Joaquin Valley communities by eliminating negative environmental impacts, including air pollution, in low-income communities and communities of color. CCEJN supports grassroots leadership to promote environmental health education, community organizing, and dialogue among rural, underserved communities of color in the San Joaquin Valley.

20.     Plaintiff ASSOCIATION OF IRRITATED RESIDENTS (AIR) is a California nonprofit corporation that advocates for air quality and environmental health in the San Joaquin Valley. Members of AIR reside in Kern, Kings, Stanislaus, Fresno, and Tulare counties in the San Joaquin Valley air basin.

21.     Plaintiff MEDICAL ADVOCATES FOR HEALTHY AIR is a California nonprofit organization based in Fresno, consisting of medical professionals living in the San Joaquin Valley who both regularly treat patients suffering from respiratory ailments that are caused or greatly

exacerbated by the Valley's unhealthy levels of air pollution, and are themselves adversely affected by air pollution. Formed in 2001, its mission is to advocate for the expeditious attainment of state and federal health-based air quality standards in the San Joaquin Valley through public education, litigation, and other means.

22. Plaintiff NATIONAL PARKS CONSERVATION ASSOCIATION (NPCA) is a 501(c)(3) nonprofit membership organization headquartered in Washington, D.C., with a Pacific Regional Office located in Oakland, California, and a Sierra Nevada Field Office located in Sacramento, California. NPCA currently has over 390,000 active members and 1.6 million members and supporters nationwide, including over 2,400 active members living in the counties that comprise the San Joaquin Valley air basin. NPCA's primary mission is to protect and preserve America's national parks and their resources, including air quality, for the use and enjoyment of present and future generations. Since its founding in 1919, NPCA has pursued its mission through advocacy, education, and strategic litigation to enforce environmental laws. For example, NPCA has worked to protect air quality in national parks nationwide and in California through the implementation and enforcement of Clean Air Act provisions that regulate air pollution sources affecting the national parks and surrounding communities.

23. Plaintiff SIERRA CLUB is a national non-profit organization with approximately 832,739 members. Of the chapters containing counties in the San Joaquin Valley air basin, the Sierra Club's Kern-Kaweah Chapter has over 1,500 members, the Tehipite Chapter has approximately 2,300 members, and the Mother Lode Chapter has over 19,500 members. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and encouraging humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. For decades, the Sierra Club has worked to enact, strengthen, and enforce the Clean Air Act and its regulations to reduce air pollution in the United States, California, and the San Joaquin Valley.

24. Plaintiffs' members live, raise their families, work, recreate, and conduct educational, advocacy, and other activities in the San Joaquin Valley. They are adversely affected by exposure to

1   levels of PM-2.5 pollution that exceed the national standards for 24-hour and annual concentrations

2   of PM-2.5 established under the Clean Air Act. Adverse effects of such PM-2.5 pollution include

3   actual or threatened harm to: their health; the health of their families; their professional, educational,

4   and economic interests, including missed work days and missed school days, among other things;

5   and their recreational and aesthetic use and enjoyment of the environment in the San Joaquin Valley,

6   including their use and enjoyment of Yosemite, Sequoia, and Kings Canyon National Parks.

7       25.   The Clean Air Act violations alleged in this Complaint have injured and continue to

8   injure the interests of Plaintiffs and their members. The relief requested in this lawsuit would redress

9   these injuries by compelling EPA to take actions mandated by Congress in the Clean Air Act to

10  improve air quality in the area violating national air quality standards: the San Joaquin Valley.

11      26.   Defendant EPA is the federal agency charged with implementation of the Clean Air

12  Act.

13      27.   Defendant MICHAEL S. REGAN is sued in his official capacity as the Administrator

14  of the EPA. He is responsible for taking various actions to implement and enforce the Clean Air Act,

15  including the mandatory duties at issue in this case.

16                          **STATUTORY FRAMEWORK**

17      28.   Congress enacted the Clean Air Act "to speed up, expand, and intensify the war

18  against air pollution in the United States with a view to assuring that the air we breathe throughout

19  the Nation is wholesome once again." H.R. Rep. No. 91-1146, at 1 (1970), *reprinted in* 1970

20  U.S.C.C.A.N. 5356, 5356. Consistent with these objectives, the Act requires EPA to set national

21  ambient air quality standards for certain pollutants, "the attainment and maintenance of which . . .

22  are requisite to protect the public health" with "an adequate margin of safety," and "to protect the

23  public welfare from any known or anticipated adverse effects." 42 U.S.C. § 7409(a), (b).

24      29.   The Clean Air Act directs EPA to designate areas with air pollution levels that exceed

25  a national standard as "nonattainment" areas. 42 U.S.C. § 7407(d)(1).

26      30.   The Clean Air Act provides that each state with a nonattainment area must adopt a

27  "state implementation plan" for improving air quality in that area to meet the national ambient air

28  quality standards. 42 U.S.C. §§ 7407(a)(1), 7410(a), 7502(b), 7513a. Such plans "shall include

enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date." *Id.* § 7502(c)(6). Plans must also include, among other things, "contingency measures," which are "specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date." *Id.* § 7502(c)(9).

31.    Under the Clean Air Act, states must submit state implementation plans and any revisions thereto to EPA for review. 42 U.S.C. §§ 7410(a)(1), 7502(b). The Act prescribes deadlines for these submissions. *See, e.g.*, *id.* §§ 7513-7513b (Subpart 4 of Part D of Title I of the Act, "Additional Provisions for Particulate Matter Nonattainment Areas"), 7513a(a)(2)(B) (particulate matter deadline).

32.    Nonattainment areas for particulate matter pollution initially are designated as "Moderate Areas." 42 U.S.C. § 7513(a).[1] State implementation plans for Moderate Areas must improve air quality to meet the relevant national ambient air quality standard "as expeditiously as practicable but no later than the end of the sixth calendar year after the area's designation as nonattainment." *Id.* § 7513(c)(1). Initial plans are due no later than 18 months after a nonattainment designation. *Id.* § 7513a(a)(2)(B).

33.    Before the attainment deadline, if EPA determines that a Moderate Area cannot practicably attain a particulate matter national ambient air quality standard by the prescribed attainment date, EPA may reclassify it as a "Serious Area." 42 U.S.C. § 7513(b)(1). If no such determination is made but a Moderate Area, in fact, fails to attain the relevant health standard, it likewise will be reclassified as a Serious Area. *Id.* § 7513(b)(2). Upon reclassification, the Clean Air Act requires states to submit a Serious Area Plan within 18 months. *Id.* § 7513a(b)(2). Reclassification from Moderate to Serious results in a new, longer attainment deadline: "as

---

[1] Sections 7513 through 7513b of the Clean Air Act, which collectively comprise Subpart 4 of Part D of Title I of the Act, refer to "PM-10" but govern nonattainment requirements for PM-2.5 as well. *Nat. Res. Def. Council v. EPA*, 706 F.3d 428, 435 (D.C. Cir. 2013) ("[B]y its express terms, Subpart 4, when enacted, governed all $PM_{10}$ particles, including those now denominated $PM_{2.5}$.")

expeditiously as practicable but no later than the end of the tenth calendar year beginning after the area's designation as nonattainment . . . ." *Id.* § 7513(c)(2). Serious Areas are also subject to additional, stricter pollution prevention and control measures than Moderate Areas. *See id.* § 7513a(b)(1).

34.     If a Serious Area, despite the extended timeline for compliance, still does not meet the particulate matter standard by the attainment date, "the State in which such area is located shall . . . submit within 12 months . . . plan revisions which provide for attainment." 42 U.S.C. § 7513a(d). The Clean Air Act specifies that plan revisions for such an overdue Serious Area must reduce direct particulate matter emissions or particulate matter precursor emissions at least five percent annually until air quality is improved enough to meet the air quality standard. *Id.* Such plan revisions are therefore commonly called "Five Percent Plans." *Bahr v. EPA*, 836 F.3d 1218, 1226 (9th Cir. 2016).

35.     The Clean Air Act requires EPA to determine whether any state implementation plan or plan revision is administratively complete. 42 U.S.C. § 7410(k)(1)(B). EPA must make this determination "no later than 6 months after the date, if any, by which a State is required to submit the plan or revision." *Id.*

36.     If a state fails to submit a required complete state implementation plan or plan revision and 6 months have passed since the deadline, EPA must make a determination stating that the state failed to submit an administratively complete state implementation plan. *See* 42 U.S.C. § 7410(k)(1)(B). Such a determination is commonly referred to as a "finding of failure to submit." *See, e.g.*, 83 Fed. Reg. 14,759 (Apr. 6, 2018).

37.     Upon issuing a finding of failure to submit, the Clean Air Act establishes a two-year deadline for the EPA Administrator to "promulgate a Federal implementation plan . . . unless the State corrects the deficiency [by making a complete state implementation plan submission], and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan." 42 U.S.C. § 7410(c)(1). This provision "ensures that progress toward [national ambient air quality standards] attainment will proceed notwithstanding inadequate action at the state level." *Nat. Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1124 (D.C. Cir. 1995).

38.     A "Federal implementation plan" must "fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan." 42 U.S.C. § 7602(y). Like a state implementation plan, a federal implementation plan must "include[] enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provide[] for attainment of the relevant national ambient air quality standard." *Id.*; *see also id.* § 7410(a)(2)(A).

39.     If EPA fails to take a non-discretionary action, such as either approving a state implementation plan or promulgating a federal implementation plan within two years of issuing a finding of failure to submit, citizens are empowered to seek a court order to compel prompt action. 42 U.S.C. § 7604(a)(2).

## STATEMENT OF FACTS

40.     This case involves EPA's failure to timely promulgate a federal implementation plan to provide for attainment of the National Ambient Air Quality Standards (NAAQS) for PM-2.5 in the San Joaquin Valley, California.

### Fine Particulate Matter

41.     Particulate matter ("PM") air pollution is not a particular chemical compound, but rather describes a mixture of solid particles and liquid droplets suspended in the air. 62 Fed. Reg. 38,652, 38,653 (July 18, 1997). PM pollution is often characterized by its size: particulate matter having a diameter of 10 micrometers or less is generally referred to as "PM-10," and particulate matter having a diameter of 2.5 micrometers or less is generally referred to as "PM-2.5." *Id.* at 38,711-12.

42.     PM-2.5 is "produced chiefly by combustion processes and by atmospheric reactions of various gaseous pollutants." 71 Fed. Reg. 61,144, 61,146 (Oct. 17, 2006). Much of the PM-2.5 in the Valley consists of ammonium nitrate particles, which primarily come from the reaction of nitrogen oxides from combustion sources—including on road and on farm motor vehicles, power generation, industrial facilities, and residential fuel burning—and ammonia from agricultural sources—including concentrated animal feeding operations and fertilizer application. *See id.*; 81 Fed. Reg. 6936, 6945, 6978 (2016).

43.     The effects of PM-2.5 on human health are significant. "Epidemiological studies have shown statistically significant correlations between elevated $PM_{2.5}$ levels and premature mortality[,] . . . aggravation of respiratory and cardiovascular disease (as indicated by increased hospital admissions, emergency room visits, absences from school or work, and restricted activity days), [and] changes in lung function and increased respiratory symptoms . . . ." 72 Fed. Reg. 20,586, 20,586-87 (Apr. 25, 2007). Even "[s]hort-term exposure (from less than 1 day up to several days) to $PM_{2.5}$ is likely causally associated with mortality from cardiopulmonary diseases, increased hospitalization and emergency department visits for cardiopulmonary diseases, increased respiratory symptoms, decreased lung function, and changes in physiological indicators for cardiovascular health." 72 Fed. Reg. 54,112, 54,128 (Sept. 21, 2007).

44.     The health burdens of PM-2.5 pollution are not evenly shared. A national examination of Medicare recipients showed that low socioeconomic status consistently increased the risk of premature death from PM-2.5 pollution. *See* Scott Zeger, *et al.*, *Mortality in the Medicare Population and Chronic Exposure to Fine Particulate Air Pollution in Urban Centers (2000-2005)*, 116 Env't Health Perspect. 1614 (2008). Further, according to a large study in the New England Journal of Medicine, people who identified as Hispanic, Asian, and particularly Black had a higher risk of premature death from particle pollution than did white people, independent of financial status. *See* Qian Di, *et al.*, *Air Pollution and Mortality in the Medicare Population*, 376 N. Engl. J. Med. 2513 (2017).

45.     Beyond posing a significant health threat, PM-2.5 also is "the main cause of reduced visibility (haze) in parts of the United States, including many of our treasured national parks and wilderness areas." *See Particulate Matter (PM) Basics*, EPA, https://www.epa.gov/pm-pollution/particulate-matter-pm-basics#effects (last updated May 26, 2021). For example, the National Park Service has reported that within Sequoia and Kings Canyon National Parks—both located in the San Joaquin Valley Air Pollution Control District—the average natural visible range has been reduced from about 150 miles to about 65 miles due to pollution, with visibility reduced to below 30 miles on high pollution days. *See Park Air Profiles - Sequoia & Kings Canyon National Parks*, Nat'l Park Serv., https://www.nps.gov/articles/airprofiles-seki.htm (last updated Nov. 19,

2019). Further, PM-2.5 and its precursor pollutants are harmful to plants, animals, and ecosystems in

the National Parks and elsewhere because they, among other things, alter the pH and nutrient

balance of bodies of water, deplete nutrients in soil, and damage sensitive forests. *See Health and*

*Environmental Effects of Particulate Matter (PM)*, EPA, https://www.epa.gov/pm-pollution/health-

and-environmental-effects-particulate-matter-pm (last updated May 26, 2021).

**The San Joaquin Valley**

46.     The San Joaquin Valley Air Pollution Control District consists of all or part of eight

counties—San Joaquin, Stanislaus, Merced, Madera, Fresno, Tulare, Kings, and Kern—located in

the southern half of the Central Valley in California. 85 Fed. Reg. 17,382, 17,383 (Mar. 27, 2020).

47.     As described in a technical report from the Center on Human Needs at Virginia

Commonwealth University, the San Joaquin Valley is home to many residents with intersecting

marginalized identities:

> [T]he San Joaquin Valley comprises a large geographic region with a number of
> urban centers surrounded by rural areas, farmland, and national parks. It is an area
> that has a much larger Hispanic population than elsewhere in the United States, and
> many residents are immigrants or migrant laborers. More than one fifth of households
> in the Valley have incomes below the federal poverty threshold. As a large
> agricultural area, the majority of jobs in the San Joaquin Valley are low-paying.
> About 30% of the region's adult population and almost 60% of foreign-born residents
> lack a high school education.

Amber D. Haley, *et al.*, *Community Risk Factors for Mortality and Exposure to Environmental*

*Hazards in the San Joaquin Valley* 21 (Feb. 2012), https://societyhealth.vcu.edu/media/society-

health/pdf/PMReport_SJV.pdf.

48.     San Joaquin Valley residents face heightened risks of premature death and other air-

related harms. According to a California State University, Fresno, report:

> Findings indicate that San Joaquin Valley residents are more likely to die before age
> 65 and lose more years of life after age 65 than do other Californians. There were
> notable gender and race/ethnicity differences, with women and whites experiencing
> greater longevity than do men, Latinos, and African Americans.

Cent. Valley Health Pol'y Inst., *Longevity for San Joaquin Valley Elders: Individual and*

*Neighborhood Characteristics*, Cal. State Univ., Fresno, (2017), https://chhs.fresnostate.edu/cvhpi/

documents/OlderAdults_ExecSum.pdf. Furthermore, according to the most recent data from

UCLA's California Health Interview Survey, about 18% of children in the Valley's eight counties

have been diagnosed with asthma—well above the California average of 14.5%. *See* UCLA Ctr. for

Health Pol'y Res., *AskCHIS Neighborhood Edition*, https://askchisne.ucla.edu/ask/_layouts/ne/

dashboard.aspx#/ (last visited Nov. 8, 2021).

### The State's Decades of Failure to Attain the
### National PM-2.5 Standards in the San Joaquin Valley

49.     The San Joaquin Valley still has not attained national PM-2.5 standards set nearly a

quarter-century ago. The plans it has submitted to EPA for decades to clean the air have often been

years late, ineffective, and legally inadequate, as demonstrated by the Valley's failure to ever meet

clean air standards for PM-2.5.

*1997 Annual and 24-hour PM-2.5 Standards*

50.     EPA first established primary and secondary[2] PM-2.5 NAAQS in 1997 after

reviewing scientific data and public comment suggesting that PM-2.5 be regulated separate and apart

from existing PM standards, which encompassed all PM-10 particles. 62 Fed. Reg. 38,652 (July 18,

1997). As EPA recognized, extremely small PM-2.5 particles penetrate especially "effectively to the

airways and gas exchange regions of the lung," causing significant mortality and morbidity. *Id.* at

38,661-62.

51.     EPA noted that short-term spikes in PM-2.5, as well as persistent longer-term

exposure to these more microscopic forms of pollution, caused significant health and welfare

impacts. 62 Fed. Reg. 38,652, 38,668-69 (July 18, 1997). EPA therefore created two PM-2.5

standards: a "24-hour" standard to capture short-term increases in PM-2.5, and an "annual" standard

to capture long-term averages. *Id.*

---

[2] Primary NAAQS must be set at levels "the attainment and maintenance of which in the judgment of the Administrator, . . . allowing an adequate margin of safety, are requisite to protect the public health." 42 U.S.C. § 7409(b)(1). Secondary NAAQS "shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator . . . is requisite to protect the public welfare from any known or anticipated adverse effects." *Id.* § 7409(b)(2). The Act provides that the "public welfare" protected by secondary NAAQS includes "effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being." *Id.* § 7602(h).

52.     In 2005, EPA designated the San Joaquin Valley Area as nonattainment for the 1997 annual and 24-hour PM-2.5 standards. 70 Fed. Reg. 944, 956 (Jan. 5, 2005). EPA initially classified the San Joaquin Valley Area as a Moderate Area effective July 2, 2014, 79 Fed. Reg. 31,566, 31,593, 31,598 (June 2, 2014), and reclassified the area as a Serious Area effective May 7, 2015, 80 Fed. Reg. 18,528, 18,533-34 (Apr. 7, 2015). Upon reclassification as a Serious Area, the area was required to attain the 1997 PM-2.5 NAAQS by December 31, 2015. *Id.* at 18,528; *see* 42 U.S.C. § 7513(c)(2).

53.     In November 2016, EPA determined that the San Joaquin Valley Area had failed to attain the 1997 annual and 24-hour standards by the December 31, 2015 attainment date for Serious Areas. *See* 81 Fed. Reg. 84,481 (Nov. 23, 2016). This determination triggered a requirement for California to submit a Five Percent Plan within twelve months of the missed attainment date, *i.e.*, by the end of 2016. *See* 42 U.S.C. § 7513a(d).

*2006 24-hour PM-2.5 Standards*

54.     In 2006, EPA strengthened only the 24-hour PM-2.5 standards, revising the maximum allowed 24-hour average concentration of PM-2.5 from 65 micrograms per cubic meter ($\mu g/m^3$) to 35 $\mu g/m^3$ to address the evolving science on health and welfare impacts of PM-2.5. 71 Fed. Reg. 61,144, 61,144 (Oct. 17, 2006) (codified at 40 C.F.R. § 50.13).

55.     In 2009, EPA designated the San Joaquin Valley Area as nonattainment for the 2006 PM-2.5 standards. *See* 74 Fed. Reg. 58,688, 58,711-12 (Nov. 13, 2009). EPA initially classified the San Joaquin Valley Area as a Moderate Area effective July 2, 2014 and—because the State could not attain the standards by the deadline—reclassified the area as a Serious Area effective February 19, 2016. *See* 81 Fed. Reg. 2,993 (Jan. 20, 2016); 81 Fed. Reg. 42,263 (June 29, 2016) (correcting amendment).

56.     Upon the area's reclassification as a Serious Area, California was required to submit a Serious Area Plan addressing attainment of the 2006 PM-2.5 NAAQS in the San Joaquin Valley no later than 18 months after the reclassification, *i.e.*, by August 21, 2017. *See* 42 U.S.C. § 7513a(b)(2); 81 Fed. Reg. 2,993, 2,994 (Jan. 20, 2016).

*2012 Annual PM-2.5 Standard*

57.     Responding to the continuing evolution in science on health impacts, EPA strengthened the annual primary PM-2.5 standard in 2012, "lowering the level from 15.0 to 12.0 $\mu g/m^3$ so as to provide increased protection against health effects associated with long-and short-term exposures." 78 Fed. Reg. 3,086, 3,088 (Jan. 15, 2013) (codified at 40 C.F.R. § 50.18).

58.     In 2015, EPA designated and classified the San Joaquin Valley Area as a Moderate nonattainment area for the 2012 PM-2.5 NAAQS. 80 Fed. Reg. 2,206, 2,217-18 (Jan. 15, 2015). This designation and classification triggered a requirement for California to submit a Moderate Area Plan addressing attainment of the 2012 PM-2.5 NAAQS in the San Joaquin Valley no later than 18 months after the designation, *i.e.*, by October 15, 2016. *See* 42 U.S.C. § 7513a(a)(2)(B).

*California's Failure to Submit Required Plans*

59.     The State of California failed to submit any of the plans mentioned in paragraphs 53, 56, and 58—respectively, a Five Percent Plan providing for attainment of the 1997 NAAQS, a Serious Area Plan providing for attainment of the 2006 NAAQS, and a Moderate Area Plan providing for attainment of the 2012 NAAQS—by the noted deadlines.

60.     On September 18, 2018, community and advocacy organizations sued the EPA Administrator on the ground that he was overdue to issue findings of failure to submit regarding the abovementioned plans. *See Comm. for a Better Arvin v. Wheeler*, No. 4:18-cv-05700-DMR (N.D. Cal. Oct. 24, 2018).

61.     On December 6, 2018, EPA issued findings that the State had failed to submit by the relevant deadlines "complete state implementation plans . . . required under the Clean Air Act . . . to implement the 1997, 2006, and 2012 national ambient air quality standards . . . for fine particulate matter . . . in the San Joaquin Valley." 83 Fed. Reg. 62,720, 62,720 (Dec. 6, 2018). These findings became effective January 7, 2019. *Id.* at 62,721.

62.     Specifically, EPA found the State had failed to submit the following plans:

            a.     "For the 1997 annual and 24-hour PM$_{2.5}$ NAAQS, . . . a [state implementation plan] submission that provides for, among other things, annual reductions in emissions of direct PM$_{2.5}$ or a PM$_{2.5}$ plan precursor pollutant within the area of

not less than five percent of the amount of such emissions as reported in the most recent inventory for the area." 83 Fed. Reg. 62,720, 62,720 (Dec. 6, 2018).

    b.  "For the 2006 24-hour $PM_{2.5}$ NAAQS, . . . a [state implementation plan] submission that meets the requirements for Serious $PM_{2.5}$ nonattainment areas, including the requirement for best available control measures (BACM)." *Id.*

    c.  "For the 2012 annual $PM_{2.5}$ NAAQS, . . . a [state implementation plan] submission that meets the requirements for Moderate $PM_{2.5}$ nonattainment areas, including the requirement for reasonably available control measures (RACM)." *Id.*

63.    EPA noted in its final rule issuing the findings of failure to submit: "No later than 2 years after the EPA makes these findings, if the State has not submitted, and the EPA has not approved, each of the required SIP submissions, the EPA must promulgate a federal implementation plan to address any remaining requirements." 83 Fed. Reg. 62,720, 62,721 (Dec. 6, 2018).

**EPA's Failure to Promulgate a Federal Implementation Plan**

64.    In May 2019, after years of delay, the State submitted revisions to its state implementation plan that purported to include each of the unsubmitted plans referenced in paragraph 62.

65.    In the two-and-a-half years since, EPA has approved only a small portion of the State's submissions for the required plans.

*Five Percent Plan for the 1997 Annual PM-2.5 Standard*

66.    EPA has not approved the State's Five Percent Plan for attaining the 1997 annual PM-2.5 NAAQS.

67.    Instead, on July 22, 2021, EPA proposed to approve in small part and disapprove in large part the State's Five Percent Plan. 86 Fed. Reg. 38,652, 38,652 (July 22, 2021). Specifically, EPA proposed to approve the plan's "2013 base year emissions inventories"—the data used as the starting point or baseline for future progress—and to disapprove the remainder of the plan, including "the attainment demonstration and related elements, including the comprehensive precursor

demonstration, five percent annual emission reductions demonstration, best available control measures (BACM) demonstration, reasonable further progress (RFP) demonstration, quantitative milestone demonstration, and contingency measures." *Id.* at 38,652.

68.    EPA proposed to disapprove the entire Five Percent Plan, with the narrow exception of the baseline inventories, based on measurements demonstrating that the San Joaquin Valley had not in fact attained the 1997 annual PM-2.5 NAAQS by the 2020 attainment deadline. 86 Fed. Reg. 38,652, 38,652 (July 22, 2021).

69.    EPA has not yet taken final action with regard to this proposed rule.

*Five Percent Plan for the 1997 24-hour PM-2.5 Standard*

70.    EPA also has not issued a final rule approving the State's Five Percent Plan for attaining the 1997 24-hour PM-2.5 NAAQS.

71.    On September 24, 2021, EPA proposed to approve in part and disapprove in part the State's Five Percent Plan for these NAAQS. 86 Fed. Reg. 53,150 (Sept. 24, 2021). Specifically, EPA proposed "to determine that the San Joaquin Valley air quality planning area has attained the" 1997 24-hour PM-2.5 NAAQS, and that, even though the contingency measures contained in the plan were legally defective, the District did not need to submit new measures because the attainment determination obviated the need for any such measures. *Id.* at 53,150.

72.    EPA has not yet taken final action with regard to this proposed rule.

*Serious Area Plan for the 2006 24-hour PM-2.5 Standard*

73.    EPA has approved part, but not all, of the State's Serious Area Plan for attaining the 2006 24-hour PM-2.5 NAAQS.

74.    On July 22, 2020, EPA approved in part the State's Serious Area Plan, including the State's request for an extension of the attainment-area deadline for another four years, from 2020 to 2024. 85 Fed. Reg. 44,192, 44,192 (July 22, 2020). EPA did not act on the contingency measures element of the plan at that time. *See id.* at 44,193.

75.    On September 1, 2021, EPA proposed "to disapprove the contingency measure element" with respect to the Serious Area requirements for the 2006 PM-2.5 NAAQS. 86 Fed. Reg. 49,100, 49,100 (Sept. 1, 2021). EPA has not yet taken final action with regard to that proposed rule.

*Moderate Area Plan for the 2012 Annual PM-2.5 Standard*

76.     Finally, EPA has not yet approved the State's Moderate Area Plan implementing the 2012 annual PM-2.5 NAAQS.

77.     On September 1, 2021, EPA "propose[d] to approve all but the contingency measure element of the submitted Moderate [A]rea [P]lan for the 2012 PM$_{2.5}$ NAAQS," but "to disapprove the contingency measure element" with respect to that plan. 86 Fed. Reg. 49,100, 49,100 (Sept. 1, 2021). EPA also proposed to reclassify the San Joaquin Valley "as a 'Serious' nonattainment area for the 2012 PM$_{2.5}$ NAAQS based on the EPA's determination that the area cannot practicably attain the standard by the applicable Moderate [A]rea attainment date of December 31, 2021." *Id.* EPA's proposal would again allow the State to punt on attainment; it would set a new Serious Area attainment deadline of no later than December 31, 2025. *See id.*

78.     EPA has not yet taken final action with regard to this proposed rule.

**Summary**

79.     EPA has not issued final approvals of the following elements of the required state implementation plan submissions referenced in its December 6, 2018, findings of failure to submit:

a.  All elements of the State's Five Percent Plan for attainment of the 1997 annual and 24-hour PM-2.5 NAAQS in the San Joaquin Valley.

b.  The contingency measures element of the State's Serious Area Plan for attainment of the 2006 24-hour PM-2.5 NAAQS in the San Joaquin Valley.

c.  All elements of the State's Moderate Area Plan for attainment of the 2012 PM-2.5 annual NAAQS in the San Joaquin Valley.

80.     Furthermore, since July 2021 EPA has proposed to disapprove the State's Five Percent Plan for attainment of the 1997 annual PM-2.5 NAAQS, with the exception of the 2013 base-year inventory element, and the contingency measures elements of the State's Five Percent Plan for the 1997 24-hour NAAQS, Serious Area Plan for the 2006 PM-2.5 NAAQS, and Moderate Area Plan for the 2012 PM-2.5 NAAQS.

81.     To date, EPA has not promulgated a federal implementation plan addressing any of state planning failures outlined in paragraph 79. And all this time, as seen for the last 25 years, the

San Joaquin Valley has not achieved the level of clean air Congress mandated or that communities in the Valley deserve to breathe.

## CLAIM FOR RELIEF

### (Failure to Promulgate Federal Implementation Plan)

82. Plaintiffs reallege and reincorporate each and every allegation set forth above, as if fully set forth herein.

83. On December 6, 2018, EPA issued findings that California had failed to submit complete state implementation plans required under the Clean Air Act to implement the 1997, 2006, and 2012 PM-2.5 NAAQS in the San Joaquin Valley. Those findings became effective January 7, 2019.

84. Pursuant to 42 U.S.C. § 7410(c)(1), EPA had a mandatory duty to promulgate, no later than January 7, 2021, a federal implementation plan addressing any aspect of the required state implementation plan revisions that EPA had not yet approved.

85. Currently, EPA has not approved the following elements of the required submissions:

    a. All elements of the State's Five Percent Plan for attainment of the 1997 annual and 24-hour PM-2.5 NAAQS in the San Joaquin Valley.

    b. The contingency measures element of the State's Serious Area Plan for attainment of the 2006 PM-2.5 NAAQS in the San Joaquin Valley.

    c. All elements of the State's Moderate Area Plan for attainment of the 2012 PM-2.5 NAAQS in the San Joaquin Valley.

86. EPA has failed to perform its mandatory duty to promulgate a federal implementation plan addressing these plan elements.

87. Accordingly, EPA has been in continuous violation of the Clean Air Act, 42 U.S.C. § 7410(c)(1), since January 8, 2021.

88. This Clean Air Act violation constitutes "a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator," within the meaning of the Clean Air Act's citizen suit provision. 42 U.S.C. § 7604(a)(2). This violation is ongoing.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court:

1.     Declare that the Administrator is in violation of the Clean Air Act with regard to his mandatory, nondiscretionary duty under 42 U.S.C. § 7410(c)(1) to promulgate a federal implementation plan addressing:

      a.     All elements of a Five Percent Plan for attainment of the 1997 annual and 24-hour PM-2.5 NAAQS in the San Joaquin Valley;

      b.     The contingency measures element of a Serious Area Plan for attainment of the 2006 PM-2.5 NAAQS in the San Joaquin Valley; and

      c.     All elements of a Moderate Area Plan for attainment of the 2012 PM-2.5 NAAQS in the San Joaquin Valley;

2.     Enjoin EPA to perform its mandatory duty to promulgate a fully compliant federal implementation plan for the State of California by a date certain;

3.     Retain jurisdiction of this matter until such time as EPA has complied with its non-discretionary duties under the Clean Air Act;

4.     Award to Plaintiffs their reasonable costs of litigation, including attorneys' fees; and

5.     Grant such further relief as the Court deems just and proper.

Dated: November 10, 2021          Respectfully submitted,

STACEY P. GEIS, SB No. 181444
sgeis@earthjustice.org
PAUL R. CORT, SB No. 184336
pcort@earthjustice.org
COLIN C. O'BRIEN, SB No. 309413
cobrien@earthjustice.org

/s/ Gregory D. Muren
GREGORY D. MUREN, SB No. 319313
gmuren@earthjustice.org
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000
Fax: (415) 217-2040

*Attorneys for Plaintiffs*

COMPLAINT

# EXHIBIT A



ALASKA  CALIFORNIA  FLORIDA   MID-PACIFIC  NORTHEAST  NORTHERN ROCKIES

NORTHWEST  ROCKY MOUNTAIN  WASHINGTON, D.C.  INTERNATIONAL

September 10, 2021

**Via Certified and Electronic Mail**
**Return Receipt Requested**

Michael S. Regan
Administrator
Environmental Protection Agency
Office of the Administrator: Mail Code 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
   E: regan.michael@epa.gov

Re:     **60-Day Notice of Intent to File Clean Air Act Citizen Suit**

Dear Administrator:

Pursuant to 42 U.S.C. § 7604(b)(2) and 40 C.F.R. part 54, we hereby give notice of our intent to commence a civil action against the Administrator of the United States Environmental Protection Agency ("EPA") for failing to perform a nondiscretionary duty under the Clean Air Act ("Act"). As further specified below, EPA has failed to carry out its nondiscretionary duty under section 110(c)(1) of the Act, 42 U.S.C. § 7410(c)(1), to adopt a federal implementation plan ("FIP") to address deficiencies in state implementation plan ("SIP") revisions for meeting the 1997, 2006, and 2012 national ambient air quality standards ("NAAQS") for fine particulate matter ("$PM_{2.5}$") in the San Joaquin Valley, California.

Inhalable airborne particles present serious air quality problems in many areas of the United States, but nowhere as extreme as in the San Joaquin Valley. Numerous scientific studies have linked particle pollution exposure, especially exposure to $PM_{2.5}$, to a variety of problems, including premature death in people with heart or lung disease; nonfatal heart attacks; irregular heartbeat; aggravated asthma; decreased lung function; and increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing.[1] The COVID-19 pandemic has tragically exacerbated the health burdens borne by communities exposed to elevated $PM_{2.5}$ levels: a recent study showed that for every 1 microgram per cubic meter increase in $PM_{2.5}$, the COVID-19 mortality rate increased by more than 10%.[2]

---

[1] *See Health and Environmental Effects of Particulate Matter (PM)*, EPA, https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last updated May 26, 2021).

[2] Xiao Wu et al., *Exposure to Air Pollution and COVID-19 Mortality in the United States: A Nationwide Cross-Sectional Study*, 6 Sci. Adv. (Nov. 2020); *see also* Daniele Contini & Francesca Costabile, *Does Air Pollution Influence COVID 19 Outbreaks?*, 11 Atmosphere 377 (2020).

Valley residents breathe extreme levels of $PM_{2.5}$—levels that EPA declared unlawfully dangerous nearly a quarter century ago. The American Lung Association's 2021 *State of the Air* report shows that the four counties in the country with the most year-round $PM_{2.5}$ pollution are *all* in the San Joaquin Valley, as well as five of the six counties with the most dangerous short-term spikes in $PM_{2.5}$ pollution.[3]

The Valley's $PM_{2.5}$ levels—in concert with the cumulative harms caused by air and water pollutants in general—are an ongoing public health and environmental justice crisis. Health problems related to $PM_{2.5}$ are myriad in the Valley: for instance, one in six Valley children gets asthma by the time they turn 18, and emergency room visits for air-related ailments spike during periods when $PM_{2.5}$ is high.[4] The Valley has proportionally many more people living in poverty and a much larger population who identify as people of color and/or Hispanic or Latino than the state or country as a whole,[5] and low-income communities and communities of color in the Valley are disproportionately exposed to air pollution and its accompanying impacts.[6]

In addition to harming health, $PM_{2.5}$ from the San Joaquin Valley also is the main cause of unsightly "haze" in several federal Class 1 areas, including Yosemite, Sequoia, and Kings Canyon National Parks, which are three of the most heavily polluted parks in the nation for air quality.[7] Alongside the Valley, these parks often see substantial reductions to average visibility from haze pollution, as well as other air pollution impacts to the various aquatic and terrestrial ecosystems of the Southern Sierra Nevada region.[8]

As you are aware, EPA first established the annual and 24-hour $PM_{2.5}$ NAAQS in 1997 after reviewing scientific data and public comment suggesting separate standards for coarse ($PM_{10}$)

---

[3] *See* Am. Lung Ass'n, *State of the Air* 18 (2021), https://www.lung.org/getmedia/17c6cb6c-8a38-42a7-a3b0-6744011da370/sota-2021.pdf.

[4] Joint Ctr. for Pol. and Econ. Studies, *Place Matters for Health in the San Joaquin Valley* 1 (Mar. 2012), http://www.fresnostate.edu/chhs/cvhpi/documents/cvhpi-jointcenter-sanjoaquin.pdf; John Amson Capitman & Tim R. Tyner, *The Impacts of Short-term Changes in Air Quality on Emergency Room and Hospital Use in California's San Joaquin Valley* at ii (June 2011), http://www.fresnostate.edu/chhs/cvhpi/documents/aqr-web.pdf.

[5] *See* U.S. Census Bureau, *QuickFacts*, https://www.census.gov/quickfacts/fact/table/.

[6] Amber D. Haley et al., *Community Risk Factors for Mortality and Exposure to Environmental Hazards in the San Joaquin Valley* 31 (Feb. 2012), https://societyhealth.vcu.edu/media/society-health/pdf/PMReport_SJV.pdf.

[7] *See Particulate Matter (PM) Basics*, EPA, https://www.epa.gov/pm-pollution/particulate-matter-pm-basics#effects (updated May 26, 2021); *Sequoia and Kings Canyon: Air Quality Information*, Nat'l Park Serv., https://www.nps.gov/seki/learn/nature/airqualityinfo.htm (last updated Aug. 25, 2021); *Yosemite: Air Quality*, Nat'l Park Serv., https://www.nps.gov/yose/learn/nature/airquality.htm (last visited Sept. 8, 2021).

[8] *See Park Air Profiles - Sequoia & Kings Canyon National Parks*, Nat'l Park Serv., https://www.nps.gov/articles/airprofiles-seki.htm#PM (last updated Nov. 19, 2019); *Health and Environmental Effects of Particulate Matter (PM)*, EPA, https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last updated May 26, 2021).

and fine (PM$_{2.5}$) particulate matter would lead to increased public health and welfare.[9] The agency lowered the 24-hour PM$_{2.5}$ NAAQS in 2006,[10] and the annual PM$_{2.5}$ NAAQS in 2012,[11] further strengthening the standards.

Air quality in the Valley currently fails to meet *any* of these national PM$_{2.5}$ standards—not even the original 1997 standards adopted more than 20 years ago. Owing to the length of time that the Valley has failed to meet the 1997 and 2006 NAAQS, it has been designated as a "Serious" nonattainment area for these standards.[12] The Valley also has been designated as a "Moderate" nonattainment area for the 2012 PM$_{2.5}$ NAAQS, although the State has admitted that it will not be able to attain by the deadline for a Moderate area and thus will need to be reclassified to Serious.[13]

In the late 2010s, the San Joaquin Valley Air Pollution Control District ("District") fell far behind on submitting plans to EPA for controlling the Valley's PM$_{2.5}$ problem. By 2018, the District had failed to submit required plans pertaining to all the PM$_{2.5}$ NAAQS. And yet, EPA did nothing to compel Clean Air Act compliance. In response, several of the undersigned groups filed a lawsuit in the Northern District of California requesting that the court order EPA to issue findings that the State had failed to submit the required plans for each NAAQS by the respective deadlines.[14]

After acknowledging noncompliance and settling the litigation, EPA issued findings of failure to submit, which became effective on January 7, 2019.[15] In its final rule, EPA noted: "No later than 2 years after the EPA makes these findings, if the State has not submitted, and the EPA has not approved, each of the required SIP submissions, the EPA must promulgate a federal implementation plan (FIP) to address any remaining requirements."[16]

In May 2019, the State submitted revisions to its SIP that purported to provide for attainment of each standard by its respective deadline, or to obtain an extension of time for attainment and provide for attainment by the extended deadline.[17]

---

[9] 62 Fed. Reg. 38,652 (July 18, 1997).

[10] 71 Fed. Reg. 61,144 (Oct. 17, 2006).

[11] 78 Fed. Reg. 3,086 (Jan. 15, 2013).

[12] 81 Fed. Reg. 2,993 (Jan. 20, 2016) (reclassification of the Valley from Moderate to Serious Nonattainment for the 2006 PM$_{2.5}$ NAAQS); 80 Fed. Reg. 18,528 (Apr. 7, 2015) (reclassification from Moderate to Serious for the 1997 PM$_{2.5}$ Standards).

[13] San Joaquin Valley Air Pollution Control Dist., *2018 Plan for the 1997, 2006, and 2012 PM$_{2.5}$ Standards and the San Joaquin Valley Supplement to the 2016 State Strategy for the State Implementation Plan* 7-1 (Nov. 15, 2018), https://www.valleyair.org/pmplans/documents/2018/pm-plan-adopted/2018-Plan-for-the-1997-2006-and-2012-PM2.5-Standards.pdf ("2018 Plan").

[14] *Comm. for a Better Arvin v. Wheeler*, No. 4:18-cv-05700-DMR (N.D. Cal., filed Sept. 18, 2018).

[15] 83 Fed. Reg. 62,720 (Dec. 6, 2018).

[16] *Id.* at 62,721.

[17] 86 Fed. Reg. 38,652, 38,654 (July 22, 2021); 2018 Plan, *supra*.

In July 2020, EPA approved in part the State's plan for attaining the 2006 NAAQS, including an extension request to allow for attainment by 2024, instead of 2020.[18] EPA left the contingency measures element of the State's plan unapproved.[19]

After missing previous attainment deadlines, the San Joaquin Valley was required to attain the 1997 annual PM$_{2.5}$ standard by December 31, 2020. But as of that date, EPA had not even reviewed the State's plan for meeting the standard. Not surprisingly, air monitoring data showed that the Valley failed to attain. Not until July 2021, seven months after the Valley should have met the 1997 standards, did EPA finally propose action on the failed plan. Specifically, EPA now proposes to approve the plan in small part and disapprove it in large part.[20] In its proposed rule, EPA acknowledged that its failure to approve the various long-overdue SIP elements meant that it "is already subject to a statutory deadline to promulgate a FIP."[21] Nevertheless, EPA has not proposed to adopt a FIP, and instead seems content to await a revised plan from the District while the Valley's residents continue to breathe unlawfully dirty air. The District, for its part, has already developed a revision that contains *no* new control measures, but that instead simply pushes back the expected attainment date to the end of 2023.[22]

Earlier this month, EPA proposed (1) to approve in large part the State's Moderate area plan for the 2012 NAAQS, which demonstrates that it would be impracticable to attain the NAAQS by the deadline, and to reclassify the Valley from Moderate to Serious for those NAAQS; and (2) to disapprove contingency measures for the 2006 and 2012 NAAQS.[23]

EPA has not acted on the State's plan for attaining the 1997 24-hour standard.

EPA thus has not yet approved or proposed to approve the following: (1) the State's full plan for the 1997 24-hour standard; (2) the State's full plan, with the exception of the inventory, for the 1997 annual standard; and (3) the State's contingency measures associated with the 2006 and 2012 standards. EPA's neglect of the San Joaquin Valley is an administrative and environmental justice travesty. It is also a plain violation of the Agency's mandatory duties under the Clean Air Act.

The Clean Air Act provides that if EPA finds a state has failed to develop and timely submit a required SIP, the Administrator must adopt a FIP covering each unapproved aspect of the SIP

---

[18] 85 Fed. Reg. 44,192 (July 22, 2020).

[19] *Id.* at 44,192-93.

[20] *See* 86 Fed. Reg. at 38,652. EPA proposed to approve the plan's emissions inventories and to disapprove all other aspects of the plan, including the comprehensive precursor demonstration, five percent annual emission reductions demonstration, best available control measures demonstration, reasonable further progress demonstration, quantitative milestone demonstration, and contingency measures. *Id.*

[21] *Id.* at 38,673.

[22] *See* San Joaquin Valley Air Pollution Control Dist., *Attainment Plan Revision for the 1997 Annual PM2.5 Standard* (July 20, 2021), http://www.valleyair.org/Workshops/postings/2021/08-19-21_1997-pm-plan/Attainment-Plan-Revision-for-the-1997-Annual-PM2.5-Standard.pdf.

[23] 86 Fed. Reg. 49,100 (Sept. 1, 2021).

within two years.[24] EPA's nondiscretionary obligation to adopt a FIP within two years of the effective date of the findings of failure to submit reflects Congress's goal to establish "statutory teeth" to enforce the submission and attainment deadlines.[25] Because EPA's two-year deadline expired on January 7, 2021, a federal district court would be authorized to order the EPA Administrator to take the required steps to fulfill this duty.[26]

EPA has already admitted that its failure to adopt a FIP violates the Act, but it has shown no sign that it is preparing a FIP or outlining any sort of strategy for actually cleaning the air in the Valley.[27] We fear that EPA is planning to evade its FIP obligations by approving the Valley's existing and forthcoming SIP submissions, which are nothing more than continuations of inadequate strategies that have failed Valley residents for decades.

It is beyond time for EPA to intercede and adopt a FIP or outline the elements of a SIP that would be adequate to attain the national standards.[28] The undersigned, as well as other groups and residents that work and live in the Valley, would be more than willing to assist in that exercise, as they know all too well the deficiencies in the Valley's air quality regulations that need to be addressed. At a minimum, an adequate FIP or SIP would close loopholes for oil and gas operations, require real emission reductions at mobile source magnet facilities, impose meaningful controls at industrial agricultural facilities (including controls on ammonia emissions), address emissions from gas-fired appliances, and require feasible controls on wood burning across the Valley.

For years, Valley residents and public health groups have offered examples of better controls that the District and EPA have chosen to ignore. Pulling these ideas together into an affirmative vision that EPA could adopt itself or provide to Valley authorities does not have to be a daunting exercise. We urge EPA to take this opportunity to listen to impacted residents and to finally focus its considerable resources on solving, instead of excusing, the Valley's air quality problems.

Should EPA fail to do so, or should it fail to otherwise fully discharge its mandated duties under section 110(c)(1) within 60 days of the postmark date of this letter, the parties listed below intend to commence a civil action to enforce EPA's nondiscretionary duty to adopt a FIP. As

---

[24] 42 U.S.C. § 7410(c)(1).

[25] *Nat. Res. Def. Council, Inc. v. E.P.A.*, 22 F.3d 1125, 1131 (D.C. Cir. 1994).

[26] *See Oklahoma v. U.S. E.P.A.*, 723 F.3d 1201, 1224 (10th Cir. 2013) ("[T]he appropriate remedy [for failure to adopt a FIP after two years] is simply a suit to compel agency action ...."); *New York v. Pruitt*, No. 18-CV-406 (JGK), 2018 WL 2976018, at *2 (S.D.N.Y. June 12, 2018) (discussing EPA's acknowledgment that it was under a mandatory duty to adopt FIP and how, therefore, "the Court has jurisdiction over a citizen suit seeking to require the EPA to perform that non-discretionary duty"); *see also Montana Sulphur & Chem. Co. v. U.S. E.P.A.*, 666 F.3d 1174, 1190-91 (9th Cir. 2012) (listing "a suit to compel agency action" as a remedy for "EPA inaction" while discussing the termination of the two-year FIP clock).

[27] 86 Fed. Reg. at 38,673.

[28] *See* 42 U.S.C. §§ 7410(c), 7602(y) (outlining possible elements of a FIP); *id.* § 7509(d)(2) (authorizing EPA to prescribe measures in SIP following failure to attain).

required by 40 C.F.R. § 54.3, this notice letter is submitted on behalf of the following organizations:

| | |
|---|---|
| Association of Irritated Residents<br>29389 Fresno Ave.<br>Shafter, CA 93263 | Committee for a Better Shafter<br>209 Golden West Ave.<br>Shafter, CA 93263 |
| Central California Environmental Justice Network<br>4991 E. McKinley Ave., Ste. 109<br>Fresno, CA 93727 | Medical Advocates for Healthy Air<br>5919 E. Robinson Ave.<br>Fresno, CA 93727 |
| Comité Progreso de Lamont<br>9812 San Fernando St.<br>Lamont, CA 93241 | National Parks Conservation Association<br>777 6th St. N.W., Ste. 700<br>Washington, D.C. 20001 |
| Committee for a Better Arvin<br>1241 Bear Mountain Blvd., Ste. C<br>Arvin, CA 93203 | Sierra Club<br>2101 Webster St., Ste. 1300<br>Oakland, CA 94612 |

We are legal counsel for the above-named organizations in this matter. Please feel free to contact us to further discuss the basis for this claim or to explore possible options for resolving this claim short of litigation. Any communications should be addressed to Stacey Geis, Managing Attorney for Earthjustice's California Regional Office, using the contact information indicated below.

Sincerely,

Stacey P. Geis
Paul R. Cort
Colin C. O'Brien
Gregory D. Muren
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
T: 415.217.2000
E: sgeis@earthjustice.org

cc via e-mail:
Deborah Jordan, Acting Regional Administrator, EPA Region 9
  (jordan.deborah@epa.gov; r9.info@epa.gov)
Gautam Srinivasan, Acting Associate General Counsel, Office of General Counsel, EPA Air and
  Radiation Law Office (srinivasan.gautam@epa.gov)
Joseph Goffman, Principal Deputy Assistant Administrator, Office of Air and Radiation
  (goffman.joseph@epa.gov)

6